# Staunton

## F. T. Blanchard and Sue B. Blanchard v. Twin City Market, Inc.

September 17, 1931.

Present, Prentis, C. J., and Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*S. Bruce Jones,* for the appellants.

*Hall, Buford & Leftwich,* for the appellee.

PRENTIS, C. J., delivered the opinion of the court.

The appellee, the Twin City Market, Inc., filed its bill against the appellants in the Corporation Court of the city of Bristol. The objects of the suit were to enjoin the prosecution of a writ of unlawful detainer in the Circuit Court of Washington county; to construe the lease of certain real estate in the city of Bristol made by F. T. Blanchard and Sue B. Blanchard to it; to secure a declaratory decree fixing the rights of the parties thereunder; and for the avoidance of a forfeiture of that lease claimed by the lessors, the appellants.

The first and second assignments of error present the same question.

The appellants, who were defendants in the court below, instead of filing a plea in abatement, appeared and moved to dissolve the interlocutory injunction which had been

awarded to restrain their prosecution of the writ of unlawfu·
detainer, and after that motion had been overruled filed a
demurrer to the bill, which was also overruled.

The contention of the appellants is that the Cor-
poration Court of the city of Bristol had no jurisdiction to
entertain the bill, and that appellee, complainant below,
had a complete and adequate remedy in the pending writ
of unlawful detainer which had been instituted in the Cir-
cuit Court of Washington county, a court having concurrent
jurisdiction in Bristol with the Corporation Court of the
city of Bristol. This contention is based upon Code, sec-
tion 6318, which reads:

"Jurisdiction of a bill for an injunction to any judgment
or judicial proceeding shall be in the court in which the
judgment was rendered or such proceeding is pending; ex-
cept that jurisdiction of an injunction to a judgment of a
justice, or to any proceeding before a justice, shall be in
the circuit court of the county, or the circuit, corporation,
or other court of the city, having chancery jurisdiction of
the county or city in which the judgment was rendered or
such proceeding is pending; and jurisdiction of an injunc-
tion to any other act or proceeding shall be in the circuit
court of the county or the circuit, corporation or other court
of the city, having chancery jurisdiction, in which the act
or proceeding is to be done, or is doing, or apprehended."

The appellants were claiming that the lease which was
involved had been terminated by them after due notice,
because of alleged breaches of conditions subsequent con-
tained in the lease, relying chiefly upon the provision of the
lease which reads: "The property hereby leased shall at
all times be under the management of a competent resident
manager, appointed by the board of directors and properly
bonded, who shall devote his entire time to the operation,
control and supervision of the entire property."

The property involved was a market house and premises.

The question of jurisdiction thus raised has been so recently and fully discussed in the case of *Southern Sand & Gravel Co., Inc.*, v. *Massaponax Sand & Gravel Corporation*, 145 Va. 317, 133 S. E. 812, that we think it only necessary to refer to the opinion in that case, which contains many citations and seems to refer to all of the pertinent authorities. In that case, the bill was filed in the Circuit Court of the city of Richmond, while the acts enjoined were in Spotsylvania county. The same section, 6318, was relied on, and the defendants appeared specially and moved the court to dismiss the temporary injunction which had been granted, on the ground that the Richmond city court had no jurisdiction. The trial court sustained the motion, and entered a decree dissolving the injunction and dismissing the bill. That decree this court reversed, and remanded the cause, with direction to the Circuit Court of the city of Richmond to hear and determine it. This language in the opinion by West, J., at p. 326 of 145 Va., 133 S. E. 812, 814, summarizes the conclusion of this court construing that section in that case: "The only limitation on the state-wide jurisdiction of the Circuit Court of the city of Richmond, given by section 5890 and the common law, is found in the venue statutes, among which are sections 6318 and 6321. The last two sections are, as we have seen, directory and not mandatory, and were never intended to repeal or modify section 5890 and thereby deprive the chancery courts of any portion of the jurisdiction conferred upon them by that section. While these sections use the word 'jurisdiction,' they merely fix the 'venue.' The enjoyment of the venue privilege granted by these sections, where, as in the instant case, the declaration, or bill, shows on its face proper matter for the jurisdiction of the court, is conditioned upon the party claiming the privilege filing a plea in abatement within the time prescribed by section 6105.

"It will be observed that defendants were present in court

on April 17, 1925, and opposed the granting of the temporary injunction, but failed, so far as the record discloses, to object to that portion of the decree in which the Richmond court takes full jurisdiction of the case by directing the injunction order to its clerk, and sending the case to rules in his office to be matured according to law. They did not, as they had the right to do, suggest to the court that the injunction order be sent to the clerk of the Circuit Court of Spotsylvania, as required by section 6321, *supra*. When process was served upon them, they made no appearance. In addition they failed to exercise the privilege given them, under section 6105, of filing a plea in abatement within the time there prescribed, and having the case transferred to the Spotsylvania court. Having failed in these respects to assert their rights, they will be considered to have waived the privilege of having the case heard and determined by the Spotsylvania court.

"The views hereinabove expressed are strongly supported by other text-writers and cases, involving somewhat similar statutes, decided by the United States Supreme Court."

■ Burks, J., in a concurring opinion, says, by way of emphasis: " 'Jurisdiction,' said Mr. Justice Brown, in *The Resolute*, 168 U. S. 437, 18 S. Ct. 112, 42 L. Ed. 533, 'is the power to adjudicate a case upon the merits and dispose of it as justice may require'

"Venue is merely the place fixed for a trial. Both are prescribed by statute. The policy of the statute in fixing venue is the convenience of the parties. It is a mere privilege of the defendant which he may waive, if he wishes, and which he will be deemed to have waived, unless he raised the objection in the manner prescribed by statute. On the other hand, the policy of the statute in fixing jurisdiction is to determine the character or nature of the cause of which the several courts of the State may take cognizance, which cannot be enlarged or defeated by any act of

the parties. Neither consent nor waiver can confer jurisdic-tion, though it may admit venue.

"The circuit courts of the State have general equity jurisdiction, including the power to grant injunctions, under section 5890 of the Code, and section 6321 directs an order granting an injunction to be sent to the clerk of such court as has jurisdiction under section 6318. This is not a limitation upon the power of the court granting the injunction, but simply fixes the venue of the case to be tried. Manifestly, it seemed to the legislature that section 6318 furnished the most convenient place to hear the controversy. But equity acts in *personam*, and may compel a party within its jurisdiction to perform an act outside of its jurisdiction. The statute is a venue statute and not a jurisdictional one."

These views are fully supported by the citations in that case. They apply in this case and the Corporation Court of the city of Bristol committed no error in overruling the demurrer and in taking jurisdiction.

Another assignment of error is that the court should have refused to perpetuate the injunction, and should have dismissed the bill. This requires a consideration of the merits of the case.

Much of the evidence is documentary and uncontradicted.

It appears that on September 26, 1928, the appellants, in writing, leased to the appellee certain valuable property located in Bristol, Virginia, known as the Bristol City Market, for the period beginning September 26, 1928, and ending February 2, 1955. The appellants had previously leased it to the Bristol City Market, Inc., which had been organized by F. T. Blanchard, one of the appellants, and certain associates who lived in Bristol. That corporation had taken possession of the premises and changed and improved the buildings so as to make them suitable for conducting a market there. It is said that the expense of such im-

provements amounted to between $60,000.00 and $70,000.00. That corporation was promoted by Blanchard (lessor), he interested R. H. Angell and H. C. Kelsey, of Roanoke, Va., and induced them to subscribe to its capital stock, and thereafter to increase their subscription, so that together they had $10,000.00 invested therein. That corporation became much involved, and the appellee here, Twin City Market, Inc., was organized as its successor to take over the premises and continue the operation of the market. Before that, however, Angell and Kelsey proposed to Blanchard and his associates in Bristol, that they would surrender their stock in the Bristol City Market, Inc., if Blanchard and his associates would pay its indebtedness. Blanchard and his Bristol associates refused to do so, and then it was agreed that the Twin City Market, Inc., appellee here, should take over the business of the Bristol City Market, Inc., and assume its obligations.

Among other things agreed upon at the formation of the new corporation was that the stock therein should be equally subscribed by F. T. Blanchard (one of the appellants who has actively represented the lessors before and during this controversy), R. H. Angell and H. C. Kelsey. Blanchard, in his testimony in this case, vigorously denies that he subscribed to the stock of the junior corporation, appellee here, and while it is true that he never signed any subscription therefor, his own letters, together with the parol evidence, prove beyond peradventure that he demanded the right to subscribe for one-third of the stock, and that this was agreed to by the only other subscribers, Angell and Kelsey, though then and thereafter he asked for extensions of time in which to pay therefor. These extensions were granted to him, which forced the other stockholders, Angell and Kelsey, to advance additional funds for which they would have been reimbursed had Blanchard paid for the stock so allotted to him.

From the funds supplied by Angell and Kelsey for their stock and for advances in addition thereto, the entire indebtedness of the Bristol City Market, Inc., amounting to $19,000.00 or $20,000.00 was paid.

Contemporaneously with the organization of the Twin City Market, Inc., under these conditions, the lease which is here involved was executed and substituted for the previous lease.

One of the provisions of this new lease about which this controversy chiefly arises reads:

"(2) The property hereby leased shall, at all times, be under the management of a competent resident manager, appointed by the board of directors and properly bonded, who shall devote his entire time to the operation, control and supervision of the entire property. None of the officers or directors of the corporation, except those who devote at least one-half their time to the active management thereof, shall receive any compensation; and the combined salaries of such officers, the manager and employees shall not exceed in the aggregate more than $3,000.00 per annum, without the consent of the lessors first had and obtained in writing."

It is shown that at the time of this lease Blanchard urged, and Angell and Kelsey agreed, that, if possible, one R. E. Coleman, who had been successful as manager of the Roanoke city market, should be employed under this clause of the lease as resident manager of the market house in Bristol. There were negotiations, and Coleman paid at least one visit to Bristol because he had been approached with the view of engaging his services, but no contract was consummated, and it is perfectly clear that he was unwilling to accept $150.00, the monthly salary which had been authorized and which Angell and Kelsey were willing to offer. Coleman and Blanchard had long been friends, and Blanchard was very much more anxious and insistent upon Coleman's employment than Angell and Kelsey were.

The question of Coleman's employment remained open for several months, but no definite offer seems to have been made either for or by Coleman or the lessee, and it appears from Coleman's testimony that he could not have been employed at the salary which the Twin City Market, Inc., by resolution of the board of directors October 1, 1928, was authorized to pay.

Because of this Blanchard was made manager of the corporation and placed in charge of its market house and business. He claims that this was only a temporary expedient, because he could not afford to neglect his other business in order to devote his whole time to his duties as manager of the market. He, however, continued in that service from September 26, 1928, the date of the lease, through to May 15, 1929, and received a salary of $150.00 a month therefor.

The market, however, did not prosper, and Angell and Kelsey, who were the only stockholders who had paid for their stock, or contributed any funds, became dissatisfied. There is abundant evidence to support their conclusion that Blanchard had proved to be so tactless in his intercourse with the tenants of the market, and had been so arbitrary in his dealings with them, that a change of management was necessary. They, therefore, removed Blanchard as manager, and entered into a contract with S. K. M., Inc., real estate and rental agents, as manager of the market, to perform all the duties devolving upon such manager, as required by the lease under the clause that has been quoted. This change was also desired by them because, while Blanchard had received $150.00 per month, they contracted for similar services with S. K. M., Inc., for approximately $65.00 per month.

At the time of this change, Blanchard made no protest or objection, for on May 15 he wrote this letter to H. C. Kelsey:

"DEAR MR. KELSEY:

"I just received your letter and notice turning over the management of the mårket to S. K. M. I expected a letter from you but I thought it would be about Coleman. I wrote you a letter this morning which I would not have written if I had gotten this sooner. I at once called up Arthur King and had him come to my office and turned blank contracts over to him with all information I had that would be of benefit to him in the handling of the market, I told him to call on me any time and that I would help out any way I could.

"Be sure to send me those two last statements I made to you and I will send you a complete report up to May 15th.

"You will please write me just what you and Mr. Angell said about the issuing of my stock in the Twin City Market, so I can make arrangements to take it up soon as I can.

"Please let me hear from you at once."

Arthur King was manager of S. K. M., Inc., real estate agency in Bristol, Tennessee, duly licensed in Bristol, Virginia, whose offices were located two or three blocks distant from the market house—the leased premises.

This apparent satisfaction with the change of management did not, however, last long, for August 26 Blanchard sent to Kelsey as secretary-treasurer of the Twin City Market, Inc., a notice of breach of contract, reading:

"1st: This contract was breached January 1, 1929, by your not having the accounts audited and distributing the rental funds January 1, April 1 and July 1. If there was no money to pay out the lessor should be so notified with a statement of conditions at that time.

"2nd: On May 15th you placed the market properties in the hands of S. K. M., general real estate and rental agents, situated on the corner of Sixth and Shelby streets, Bristol, Tennessee, instead of employing a manager for the market with experience who would give his entire time and

attention to the renting and collection of rents, control the operation and management of the market, and have his office and complete control in the market."

It is remarked in passing that for a large part of the period involved Blanchard had himself been the manager, and knew more about the receipts and disbursements of the corporation than any one else; so that in this notice of the breach of the contract his reference to auditing the accounts is not impressive.

After the receipt of this notice, Blanchard was told that as he had charge of the market as manager until May 15, 1929, he should be fully advised as to the accounts and transactions of the corporation in connection with the market business, and it had not been thought that an audit would be either necessary or desirable; but that if he was not satisfied with the management of the property by S. K. M., Inc., he could say so, and he could recommend somebody who he thought could conduct the business better than it had been conducted. Afterwards there was a meeting between Blanchard, Angell and Kelsey, in Roanoke, and it was agreed that there should be an audit of the books of the company by certified auditors, and the auditors who were designated by Blanchard were selected, and the accounts have been audited.

There had been an unusual flood in the summer of 1929, which had damaged the market property, and because of this, as well as because of the extension and development of chain store business in Bristol, it seems to have been recognized that it had become impossible to conduct the market house business profitably in Bristol pursuant to the original plans of these parties. Angell and Kelsey then sought to induce Blanchard to release the lessee corporation from the obligation of the lease to use the property strictly for market purposes, and to authorize the subletting of the premises for any other purposes for which it might be available.

This Blanchard declined and insisted upon the market business being conducted upon the premises in strict accordance with the provisions of the lease.

It is now agreed by all of the parties (and this is about the only thing about which they do agree) that because of the changed conditions it is not probable that the market house business can be conducted there profitably. This is a matter of supreme importance to them all, because, instead of a specific rental, the lease provides that the lessors and the lessee corporation shall each have one-half of the net profits of the business. So far, the profits have been negligible, though it is claimed for the lessee that the prospects are better. The outlook is bad for both—for the Blanchards (the lessors) because the property is subject to the lease until 1955, and for Angell and Kelsey because of their large investment in the enterprise, so that should the lease be surrendered without compensation to the lessee corporation, they will lose their entire investment.

On March 31, 1930, through their attorney, the appellants gave notice to the appellee of the forfeiture of the lease on account of the breaches complained of in the notice heretofore referred to. This notice, after reciting the same alleged breaches, concluded: "Therefore, this is to notify you that under the terms of paragraph last above quoted, I am entering upon and taking possession of the premises described in the said lease and have re-entered upon the said demised premises as of my former estate."

Following this, Blanchard attempted to make forcible entry upon the property by removing the outer locks and substituting other locks therefor. This was resisted, the new locks were taken off and Blanchard was notified to cease interference with the property, and to desist in his attempts to take forcible possession thereof. This was followed by the action of unlawful detainer, to which reference has been made, and this suit.

It is claimed for the appellee that there has been no substantial breach of the contract of lease.

It is shown that the audit referred to has been made by auditors selected by Blanchard.

It is shown that the placing of the property in the hands of S. K. M., Inc., at least for the time, was acquiesced in by Blanchard, and it is contended that because of this acquiescence the lessors are estopped to claim that there has been a breach of the covenant requiring the employment of a manager. It is alleged that Blanchard well knew that under present conditions and those which have existed ever since the lease became effective, it is unnecessary to employ a manager for the property who will devote his entire time and attention to the management of the property, and that by accepting the position of manager himself, when he was conducting another independent business, and by acquiescing in the employment and continuance of S. K. M., Inc., as manager, he has waived any right to insist upon a forfeiture of the lease on this ground.

It is shown by the minutes of the initial or organization meeting of the Twin City Market, Inc., that Blanchard was present as one of the incorporators; that he was elected chairman; that he was elected a member of the board of directors for the ensuing year, and until their successors should be elected and qualified; and that the directors were authorized and directed to issue the maximum capital authorized by the certificate of incorporation, $75,000.00, in such amounts as from time to time might be determined by the board, and as provided by law, at the price of $25.00 a share. On the same date, October 1, 1928, the minutes of the first meeting of the board of directors of the corporation show that Angell, Blanchard and Kelsey, all the members of the board of directors, were present; that Blanchard was chosen temporary chairman and Kelsey temporary secretary; that the minutes of the first meeting of the incorporators were

read; that the officers elected for the first year were, R. H. Angell, president; F. T. Blanchard, vice-president, and H. C. Kelsey, secretary and treasurer; that a seal was adopted; and "upon motion duly made and seconded, it was resolved that certificates of the capital stock of this company to the amount of $75,000.00, in the form submitted to this meeting, be issued as soon as they can legally be issued upon the payment of $25.00 per share, the same to be signed in the name of the company by its president and treasurer, with the company's seal affixed thereto and attested by its secretary." The First National Bank of Bristol, at Bristol, Va., was chosen as the depository, in which the treasurer was authorized to open a bank account. It was affirmatively resolved that none of the officers receive any salary. "Upon motion duly made and seconded, the secretary and treasurer was directed to employ a suitable manager at a salary not to exceed the following sums: $150.00 until monthly income of company reaches $1,500.00; $200.00 when monthly income of company reaches $1,500.00; $250.00 when monthly income of company reaches $2,000.00;" and the manager was directed to execute a bond for $2,500. It was also resolved "that the proper officers of the company be and they are hereby authorized to buy the assets of the Bristol City Market, more particularly described in the deed dated September 26, 1928, presented at this meeting, from Bristol City Market, Incorporated, at the price stated in said deed; and that the proper officers of the company be, and they are hereby, authorized to execute on behalf of the company the new lease from Frank T. Blanchard and Sue B. Blanchard, his wife, to Twin City Market, Incorporated, dated September 26, 1928, which lease will take the place of the lease mentioned in the deed from Bristol City Market, Incorporated."

There is much testimony, oral and written. The writings consist chiefly of letters exchanged between the parties, are inconsistent with each other, their expressions naturally

changing with their fading hopes for the success of their joint enterprise. It is, however, quite apparent that there has been no concealment, and that Blanchard has had actual knowledge of all the transactions of the corporation, in which only the three were interested. As has been stated, while it is shown that he demanded one-third of the stock and repeatedly asked for time in which to pay for it, he now repudiates his agreement. It is apparent that he now desires to relieve the lessors of all the obligations of the lease and to resume possession of the property, which desire, under the circumstances, is quite natural.

It is also apparent that his associates, Angell and Kelsey, who have contributed all of the capital which has been necessary to conduct the affairs of the lessee corporation (unless the unexpected should happen and the market become profitable), have no other means of reimbursing themselves except by driving as hard a bargain as they can with the lessors.

That it is also to the interest of the lessors and lessee alike to compromise their differences by a fair agreement with each other in order to relieve themselves from still greater losses, is quite apparent.

The trial court seems to have fully met and disposed of the present litigation in the best way immediately possible. Blanchard, as lessor, is estopped to deny every fact which he knew as incorporator and director of the lessee corporation, so that he cannot now complain of its capitalization with which he was familiar, and one-third of which he agreed to supply.

The decree perpetuates the injunction against the unlawful detainer proceeding. It holds that F. T. Blanchard and Sue B. Blanchard, under the allegations of their cross bill, are not entitled to a rescission of the lease agreement, and so adjudges and decrees. Of course, this adjudication applies only to the facts then shown to exist. It does not prevent them from reopening the question, if

they should hereafter be in a position to allege and prove any repeated or continuing breaches of the lease which entitle them to re-enter and repossess their property as of their former estate.

The decree proceeds: "Responding to paragraph 6 of complainant's bill and to clause 3 of the prayer thereof, asking for a declaratory decree as to the stipulation in the lease agreement involved relating to the employment of a full time resident manager, the court is of opinion that such manager may reside either in Bristol, Virginia, or Bristol, Tennessee, and that a corporation may be employed as such manager. However, if a corporation is employed, it must act through some competent person as though an individual were employed, that is to say, some one 'who shall devote his entire time to the operation, control and supervision of the entire property.' Such person to be put in charge shall devote his undivided time and attention to building up, maintaining and supervising the market in question. Although defendants have by their assent and acquiescence waived a full compliance with this stipulation on the part of complainant for the time being, they are not precluded from exacting full performance thereof in the future. All of which the court doth so declare, adjudge and decree."

This is all that the appellants are entitled to under the facts shown by this record. Compliance with this and other essential requirements of the lease will doubtless continue to exhaust the revenues of the lessee company, but the decree construes that clause of the contract of lease properly. This construction the lessors have the right to insist upon. That the trial court realized that each of the litigants had strong equities is apparent, because it directed the costs to be equally apportioned between them. We can do no better with this difficult condition at present than the trial court has done.

The decree will, therefore, be affirmed, without costs.

*Affirmed.*